**ZIV TELEVISION PROGRAMS, INC.,**
Plaintiff,

v.

Joseph P. DUCHAINE, doing business as
My Bread Baking Company,
Defendant.

Civ. A. No. 58–568–J.

United States District Court
D. Massachusetts.

Feb. 7, 1961.

28

George B. Goodman, New Bedford, Mass., for plaintiff.

Leon J. Kowal, Boston, Mass., Gerald P. Walsh, New Bedford, Mass., for defendant.

JULIAN, District Judge.

The plaintiff, Ziv Television Programs, Inc., a New York corporation having a usual place of business in New York City, and also authorized to do business in Illinois and Ohio, brings this action to recover liquidated damages for alleged breach of contract against Joseph P. Duchaine, of New Bedford, Massachusetts, doing business as My Bread Baking Company.

The instrument on which this action is based bears the title of "Ziv Television Film Lease" and purports to be an agreement made on October 11, 1956, between Ziv, lessor, and Quality Bakers of America Cooperative, Inc., as agent for My Bread Baking Company, lessee, whereby Ziv leased and licensed under copyright to the lessee, for television broadcasting purposes only, films designated as "Men of Annapolis" for 52 telecasts, one each week, at Providence, R. I., for the price of $484 for each telecast, the programs to start no earlier than January 15, 1957, and no later than February 15, 1957. The price was subject to an advertising agency commission of 15 per cent. The instrument, among other things, further provided that Ziv would deliver 39 new subjects, 13 of which would be repeated once, and that "damages for the breach of contract shall be the full rental stipulated in this contract." It also stated that the instrument contained all of the terms of the agreement between the parties thereto and that there were no others. The instrument was signed for Ziv by Rifkin, its vice president, and for Quality Bakers of America Cooperative, Inc., by Coffey, who was in charge of the radio and television section in Cooperative's advertising department. Following Coffey's signature appears the handwritten date "10/18/56."

Ziv alleges that Cooperative in executing the agreement in question acted as the duly authorized agent of Duchaine. This is denied by Duchaine who further claims that the taking effect of any contract between the parties was subject to the condition precedent that the "scheduled dates would be useful to the defendant" and that they were in fact "of no use to the defendant as the plaintiff well knew."

The basic function of Ziv in 1956 and at all times pertinent to this case was to produce television shows on film for local and regional advertisers to be sold through television networks and advertising agencies, or directly to clients. Rifkin was Ziv's vice president in charge of sales. About 125 Ziv salesmen throughout the country were under his direct supervision. Among these was a man named Musnick.

Duchaine has been engaged in the bakery business in New Bedford, under the name of My Bread Baking Company, for about 30 years. He employed 40 to 50 persons and his market embraced New Bedford and other communities in Massachusetts, and Providence, R. I. He was also president and treasurer of a radio broadcasting company in New Bedford.

Quality Bakers of America Cooperative, Inc., is a nonprofit corporation with offices in New York City, established to assist independent bakers to meet the competition of corporate chains. It is staffed with more than 200 employees,

and is organized to render 13 distinct services to the independent baking industry in the United States and Canada. Its members are free to make use of any or all of these services but are not required to use any of them. When rendering a requested service Cooperative does not act as a general agent of the member. It acts for the member only upon his specific instructions with reference to each transaction.

Duchaine has been a member of Cooperative for many years and its president continuously since 1945. Membership in Cooperative is by invitation. Its policies are determined by a board of directors and carried out on orders of the president by department heads operating under a general manager who is responsible to the president. Duchaine devoted an average of two days a week to the performance of his duties as president.

Cooperative owns the brand name "Sunbeam Bread" and franchises its use to the members. It advertises the brand name for the benefit of the members but receives no royalties.

Cooperative maintains an advertising department which has grown since 1956 and currently employs 60 to 80 people. The department makes recommendations to members, counsels and assists them in developing their advertising programs, and at their request prepares market surveys.

Within the advertising department there is a radio and television section. A member may call upon personnel in that section to advise him about buying radio or television time. When a member decides on what he wants to buy he may buy it himself or have Cooperative buy the time for him and even supervise the program.

In 1956, for several years prior thereto, and until March, 1957, when he left Cooperative, Coffey, who signed the agreement involved in this case, was in charge of the radio and television section. An employee named Nicolait was Coffey's administrative assistant and succeeded Coffey in March, 1957. Duchaine knew both men well. As a member of Cooperative he had called on Coffey for advice on radio and television advertising, had discussed programs with him, and on occasion, for some two years including 1956, had used him to buy time for spot announcements on radio and television. He had never bought shows through Coffey. Whenever he requested Coffey to buy time for him it would be on definite instructions as to date, hour, and amount of time, without authority to Coffey to vary them.

In August, 1956, Musnick, on instructions from Rifkin and accompanied by Coffey, went to New Bedford to confer with Duchaine for the purpose of interesting him, and through him the other members of Cooperative, in the purchase of a television film entitled "Men of Annapolis," consisting of 39 episodes, then in process of being made by Ziv. Present and participating at the conference were Duchaine, Musnick, Coffey, and Duchaine's sales manager. At Musnick's request Duchaine viewed a pilot film of the proposed show and voiced the opinion that it had good entertainment value. Musnick then inquired about the annual conference of the members of Cooperative which was scheduled to be held in New York City in the last week of September, 1956, and expressed the hope of selling the show to a sufficient number of members (between 20 and 30) to enable Ziv to put the show "on the road." He told Duchaine that he would be grateful if Duchaine would give him a commitment to buy the show for his own company and televise it in Providence, R. I., that since Duchaine was president of Cooperative such a commitment would help him (Musnick) to sell the show to the other members at the conference. Duchaine told Musnick in substance in the presence of Coffey that he would buy the show on these conditions: the show was to begin on the first Monday of January, 1957 (January 7); class A time was to be obtained for the show from a Providence television station, and the time obtained was to be on Monday evenings; that unless these con-

ditions were met he would not buy the show; that it was essential to procure the proper "time slot" because without this slot the show would be of no value to him.

Duchaine never waived or modified these conditions. He never authorized Coffey or any other person to waive or change them. Nevertheless, none of the conditions stated appears in the written agreement.

Musnick assured Duchaine that Ziv would take care of the time, that they would deliver the first Monday night in January, class A time, that it would be no problem, that they would deliver the time and the film.

Class A time is premium time, the most expensive time, and extends from about 7:00 p. m. to 9:30 p. m. or, at the latest, 10:00 p. m.

Musnick reported to Rifkin on the conference he had with Duchaine and informed him that one of the conditions stated by Duchaine was that he had to have the right time slot for the film and that he had to have it early in January if it was to be of any value to him.

At the time of the conference at New Bedford both Rifkin and Musnick knew that because of an agreement made by Ziv with the Defense Department in return for the Department's consent to the filming of "West Point Story" (another Ziv production) and "Men of Annapolis," Ziv in order to avoid a conflict in the showing of the two service films would not release "Men of Annapolis" before January 15, 1957. The showing of "West Point Story" began in October, 1956. The fact that "Men of Annapolis" would not be released before January 15, 1957, was never disclosed to Duchaine or to Cooperative. Ziv's release date for "Men of Annapolis" throughout the country was in fact January 15, 1957.

The pilot film was exhibited to the members of Cooperative at their conference in New York City late in September or early in October, 1956. At the conference Duchaine told the members that the film had entertainment value, that they should give it consideration, that a certain number of members would have to buy it before it could be produced and put on the road, and that he was considering the film for his own company. (The show was eventually sold to only 14 or 15 members of Cooperative.) At this conference Musnick again assured him that the television time required by his company would be obtained. In the course of a talk early in September, 1956, Coffey had informed Rifkin that the Duchaine agreement would be signed only when they received a piece of time satisfactory to Cooperative or Duchaine. Nothing, however, was said as to who was to procure the time.

Rifkin testified that Ziv salesmen were never permitted to buy time for film lessees. I find that Musnick in fact lacked authority to promise Duchaine that Ziv would obtain the television time required for the showing of "Men of Annapolis." Duchaine, however, relied on Musnick's assurances that Ziv would procure the necessary time and dealt with him on that basis. I do not accept Rifkin's testimony that regulations of the Federal Communications Commission prohibited producers such as Ziv from procuring television time for prospective film lessees. Counsel for both parties at the Court's request, and the Court itself, have searched for statutes and regulations that would substantiate Rifkin's testimony. No such statute or regulation has been found. Duchaine was never told and did not know of any restriction on Ziv's activity in this regard. As late as November 13, 1956, about a month after Rifkin and Coffey had signed the agreement, Coffey in a communication addressed to Duchaine concerning "Men of Annapolis" made no mention of the fact that an agreement had been signed. In anticipation of the time and film being obtained for him, Duchaine began to prepare promotional publicity for the show. When he was informed by Coffey and Nicolait that the required time had not been and could not be obtained from either of the two Providence television stations, Duchaine contacted one of the

stations in December and was told that it had no available time and would give no assurance that it would have any before April, 1957.

Duchaine did not learn until sometime in March, 1957, that an agreement had been signed in his behalf.

He has never approved, confirmed, or ratified the agreement by word or conduct.

The television time required by Duchaine for the showing of "Men of Annapolis" was never secured by anyone. Duchaine did nothing to lead Ziv or Cooperative or anyone in either organization to believe that the time had been secured. When Coffey signed the agreement he knew that the time had not been obtained. Neither Coffey nor any other officer or employee of Cooperative ever represented to Ziv that the time had been obtained. The evidence does not disclose that Rifkin or any other person in the Ziv organization had in fact assumed from the execution of the unconditional agreement by Coffey that the time had been obtained. Rifkin simply took the position that the procurement of the required time was not the concern of the Ziv organization. No one connected with Ziv ever made any inquiry to ascertain whether the time had in fact been arranged for although both Rifkin and Musnick knew that without the time the film would be useless to Duchaine. Since no time was ever procured, the film was never delivered to and was never used by Duchaine. Without the time the show was in fact useless to him.

The evidence does not disclose why Coffey signed an unconditional agreement when he knew that the conditions laid down by Duchaine had not been fulfilled. Coffey did not testify. Coffey was in the courtroom on the first and second days of the trial and counsel for both parties knew it. In answer to questions put to him by plaintiff's counsel, Duchaine identified Coffey in the courtroom early in the afternoon of the first day. Duchaine testified that Coffey had come at the request of Duchaine's counsel. There is no evidence that he had been summoned. The trial was held on Thursday and Friday and was concluded on the following Monday. Coffey did not return on Monday. In its brief filed after the conclusion of the trial the plaintiff contends that the Court should consider the defendant's failure to call Coffey as a witness "as evidence and conduct in the nature of an admission" by the defendant that Cooperative's or Coffey's authority was not limited. At the time of the trial Coffey was no longer connected with either Cooperative or Duchaine and had not been since March, 1957, when he ceased to be an employee of Cooperative. It does not appear that the plaintiff or its counsel did or attempted to do anything to secure Coffey's continued attendance. At no time did plaintiff's counsel intimate to the Court that he desired Coffey's testimony. Since the burden of proving that the existence of the agency and the scope of the agent's power to act for the defendant was on the plaintiff, it might well be contended that the plaintiff's failure to call or make an attempt to call Coffey as a witness when it could easily have done so should lead to inferences unfavorable to the plaintiff. The reason, however, for the failure of either party to call Coffey to the stand has never been disclosed and remains a matter of speculation. I decline to draw any inference from such failure.

■■■ The relationship of principal and agent between Duchaine and Cooperative came into existence, if at all, at the conference held at New Bedford, Massachusetts, in August, 1956. Therefore the law to be applied to determine the creation of the relationship is the law of Massachusetts. Erie R. Co. v. Tompkins, 1938, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188; Restatement: Conflict of Laws, § 343. The same law will be applied to determine the extent of the agent's authority to act for the principal. Id., § 345, Comment (a). In the absence of sufficient evidence to establish in what state Coffey signed the agreement in question, the law of Massachusetts will also be applied to determine whether the execution of the agreement in behalf of

Duchaine imposed any contractual duty upon Duchaine. See, Id., § 345; see also, Bearse v. McLean, 1908, 199 Mass. 242, 85 N.E. 462.

 I find that Cooperative was not the general agent of Duchaine. The relationship established between Duchaine and Cooperative was that of principal and special agent. Cooperative was authorized by Duchaine, subject to specified conditions, to conduct a single transaction between Duchaine and Ziv involving the television film "Men of Annapolis." See, Restatement: Agency, 2d § 3. The conditions were known to Ziv and constituted definite and clear limitations on Cooperative's authority to act for Duchaine.

I find that neither Cooperative nor Coffey had actual or apparent authority to enter into an unconditional agreement in behalf of Duchaine. The conditions laid down by Duchaine were never waived or modified by him or by any other authorized person. The mere fact that Cooperative was the special agent of Duchaine did not empower Cooperative to waive or vary the conditions. Masse v. Smitherman Cotton Mills, Inc., 1955, 333 Mass. 374, 130 N.E.2d 876.

"One dealing with an agent with knowledge of limitations on the agent's authority cannot hold the principal for acts of the agent outside those limitations." Howard v. Barnstable County National Bank, 1935, 291 Mass. 131, 137, 197 N.E. 40, 43.

If it be contended, despite my findings, that Coffey's statement to Rifkin early in September to the effect that the Duchaine agreement would be signed only when television time satisfactory to Cooperative or Duchaine had been obtained, and the subsequent signing of the agreement by Coffey in October, could together be construed as an implied representation by Coffey to Ziv that the time had in fact been secured, the plaintiff's case would not be strengthened. "A disclosed principal * * * is not thereby subject to liability because of untrue representations by an agent as to the existence or extent of his authority or

the facts upon which it depends." Restatement: Agency, 2d § 168; see also Comment (a) under same section.

"The fact that the principal manifests to a third person that the agent is to act if a contingency occurs does not of itself lead to the inference that the principal invites him to rely upon the agent's manifestation that the contingency has occurred." Id. § 170, Comment (b); see also § 171, Comment (a).

It follows that the agreement in question never became binding upon the defendant and that the plaintiff is not entitled to recover.

Judgment will be entered for the defendant.